**Not for Publication**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| ROBERT BENHENNI, | : | |
| | : | |
| Petitioner, | : | Civil Action No. 15-8511 (ES) |
| | : | |
| v. | : | OPINION |
| | : | |
| BAYESIAN EFFICIENT STRATEGIC | : | |
| TRADING, LLC, | : | |
| | : | |
| Respondent. | : | |

SALAS, DISTRICT JUDGE

This matter is before the Court upon Petitioner Robert Benhenni's ("Benhenni" or "Petitioner") petition to vacate and/or modify an arbitration award. (D.E. No. 1 ("Petition"); D.E. No. 2-1 ("Mov. Br.")). Respondent Bayesian Efficient Strategic Trading, LLC ("BEST" or "Respondent") opposes the petition. (D.E. No. 12 ("Opp. Br.")).

Having considered the submissions made in support of and in opposition to Petitioner's application, the Court decides this matter without oral argument. *See* Fed. R. Civ. P. 78(b). For the reasons below, the Court DENIES the petition to vacate and/or modify the arbitration award.

### I.     The Court has Subject Matter Jurisdiction under 28 U.S.C. § 1332(a)

The Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, "does *not* provide a federal cause of action to ground subject-matter jurisdiction for . . . [a] motion to vacate." *Goldman v. Citigroup Global Mkts., Inc.*, No. 15-2345, 2016 WL 4434401, at *5 (3d Cir. Aug. 22, 2016) (emphasis added); *see also V.I. Hous. Auth. v. Coastal Gen. Constr. Servs. Corp.*, 27 F.3d 911, 915 (3d Cir. 1994) ("[T]he Arbitration Act does not supply federal jurisdiction where it does not

- 1 -

otherwise exist."). So, there must be diversity of citizenship or some other independent basis for federal jurisdiction to exist. *See Goldman*, 2016 WL 4434401, at *5 (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 25 n.32 (1983)).

Here, the Court finds that there is an independent source for federal subject matter jurisdiction because diversity jurisdiction exists under 28 U.S.C. § 1332(a). The parties are citizens of different states. (*See, e.g.*, Petition ¶¶ 1-2). An arguably thornier issue, however, is whether the amount-in-controversy requirement is met. The Court finds that it is for the following reasons.

In the underlying arbitration proceedings, Benhenni sought damages in excess of $375,000 plus interest, attorney's fees, and costs. (*See, e.g.*, *id.* ¶ 29; D.E. No. 1-8 at 24). But, in the instant petition, "Benhenni seeks to vacate that portion of the [a]ward which granted BEST's motion to dismiss and limited Benhenni's breach of contract claim to $10,000." (Petition ¶ 35).

"[T]he amount in controversy in a petition to *compel arbitration or appoint an arbitrator* is determined by the underlying cause of action that would be arbitrated." *Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 877 (3d Cir. 1995) (emphasis added).

But where there is already an arbitration award, there are different approaches in determining how to compute the amount in controversy. As the D.C. Circuit has stated,

> [C]ircuits have used three different approaches to this question: the award, the demand and the remand approaches. Under the award approach, the amount in controversy is determined by the amount of the underlying arbitration award regardless of the amount sought. Pursuant to the demand approach, the amount in controversy is the amount sought in the underlying arbitration rather than the amount awarded. The remand approach appears to apply if the petition includes a request to remand and reopen the arbitration proceeding, in which case the amount in controversy is the amount sought in the underlying arbitration.

- 2 -

*Karsner v. Lothian*, 532 F.3d 876, 882 (D.C. Cir. 2008) (internal citations omitted).

Although the Third Circuit does not appear to have squarely addressed which approach is appropriate, the Court finds instructive the Circuit's rulings in other circumstances.

Namely, in *Jumara v. State Farm Ins. Co.*, the plaintiffs sought to compel arbitration with their insurance company, but did not demand any money. *See* 55 F.3d at 876-77. The Third Circuit examined the insurance policy and determined that plaintiffs could potentially recover $200,000 and this was sufficient for the amount-in-controversy requirement. *See id* at 877. The Third Circuit reasoned as follows:

> The allegations on the face of the complaint control the amount in controversy unless it appears to a legal certainty the claim is really for less than the jurisdictional amount. Indeterminacy of the amount to be recovered is therefore not sufficient to defeat diversity jurisdiction, and so it is immaterial that the Jumaras might eventually recover less than $50,000 from State Farm. Given that the Jumaras allege quite serious injuries and an entitlement to as much as $200,000 in underinsured motorist benefits, we cannot say with legal certainty that the Jumaras will recover less than $50,000.

*Id.* (internal citations and quotation marks omitted)); *see also Manze v. State Farm Ins. Co.*, 817 F.2d 1062, 1068 (3d Cir. 1987).[1]

Indeed, as the D.C. Circuit stated, "the award approach has the *least* appeal" and "the demand approach has *merit*." *See Karsner*, 532 F.3d at 882-883 (emphases added). Among other reasons, the D.C. Circuit set forth that the "demand approach . . . avoids the potential problem (under the award approach) that the court could compel arbitration but then lack

---

[1] *See also U.S. Olympic Committee v. Ruckman*, No. 09-4618, 2010 WL 2179527, at *7 n.11 (D.N.J. May 28, 2010) (stating that, based on *Jumara*, "it would appear that the Third Circuit would follow that line of cases considering the amount sought in the arbitration demand, rather than the amount actually awarded"—but also noting that, given the factual context in *Jumara*, "[o]nce the award has been entered, the Third Circuit might consider it more appropriate to rely on the award amount").

jurisdiction to review the arbitration it ordered" if a petition to confirm or vacate an arbitration award subsequently arose from the same claim.  *See id.* at 882-884; *see also Pershing, L.L.C. v. Kiebach*, 819 F.3d 179, 182-83 (5th Cir. 2016) (adopting the "demand approach" because (1) it "recognizes the true scope of the controversy between the parties," (2) where the "federal district court has diversity jurisdiction over a motion to compel arbitration based on the amount demanded in the petition" the "award approach" would divest jurisdiction "over a later petition to confirm or vacate the arbitration award in the same case if the award falls below the jurisdictional threshold," and (3) "the amount in controversy is measured the same way in federal court for litigation and for matters submitted on petitions to compel arbitration: the plaintiff's pleading, not the ultimate result in the case, governs jurisdiction" (internal citations and quotation marks omitted)).

Applying the demand approach in the instant action is bolstered by the Petitioner's request to "remand the arbitration for an evidentiary hearing" where he would undoubtedly seek more than $75,000.  (*See* Petition at 11); *see Peebles v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 431 F.3d 1320, 1325 (11th Cir. 2005) ("[A] federal court has subject matter jurisdiction where a party seeking to vacate an arbitration award is also seeking a new arbitration hearing at which he will demand a sum which exceeds the amount in controversy for diversity jurisdiction purposes.").

Accordingly, the Court finds that the amount in controversy in the instant matter exceeds $75,000 and diversity jurisdiction under 28 U.S.C. § 1332(a) exists.

## II.    Factual Background

Benhenni is a professional in the financial industry.  (Petition ¶ 5; D.E. No. 1-10 ("Interim Arb. Opinion & Award") at 3).  He formerly worked as an independent contractor and

employee of BEST.  (D.E. No. 2-2 ("Benhenni Aff.") ¶ 1).  BEST provides research, trading strategies, and risk management to an affiliated investment management firm called "BEAM," from which BEST receives income.  (Petition ¶ 8).  BEST provides these services by using a certain model called the Global Dynamic Asset Allocation Bayesian Model ("GDAA Model").  (*Id.* ¶¶ 6, 8).  BEST also provides information technology and operational services to BEAM without using the GDAA Model.  (*Id.* ¶ 8).

Benhenni's employment relationship with BEST materialized in 2012.  (*See* Petition ¶¶ 10-13; Benhenni Aff. ¶¶ 5-11).

In March or April 2012, Benhenni met with BEST's president, Jose Mario Quintana ("Quintana").  (Petition ¶ 10; Benhenni Aff. ¶¶ 2, 5).  Quintana told Benhenni that he wanted Benhenni to serve as a consultant for a three-month period to determine if the GDAA Model could be applied to soft commodities.  (Petition ¶¶ 10-11; Benhenni Aff. ¶¶ 5-6).

In July 2012, Benhenni informed Quintana and BEST's Chief Operating Officer that he would consult at a $250/hour (or $10,000 weekly)—which was a significant reduction from Benhenni's prior consultancy at Morgan Stanley where he was paid $700,000 annually.  (Petition ¶ 12; Benhenni Aff. ¶ 7).  BEST counter-offered with $10,000/month *without* a full-time commitment such that Benhenni could earn money by consulting elsewhere.  (Petition ¶ 12; Benhenni Aff. ¶ 8).  Benhenni accepted this part-time, three-month consultancy offer.  (Petition ¶ 13; Benhenni Aff. ¶ 11; *see also* D.E. No. 1-3).  And, in October 2012, BEST sought to extend the part-time consultancy arrangement for an additional three months, increasing Benhenni's compensation from $10,000/month to $15,000/month.  (*See* Petition ¶ 13; Benhenni Aff. ¶ 17).[2]

---

[2] Although the Petition states that "the part-time consultancy . . . was extended for an additional three months with an increased monthly fee of $15,000," (Petition ¶ 13), Benhenni's affidavit suggests that Quintana offered Benhenni this extension, but that "[u]pon information and belief, we did not sign" the extension agreement.  The basis for this discrepancy is unclear, but appears immaterial to the Court's disposition of the Petition.

By the end of 2012, BEST sought to hire Benhenni as a full-time employee, offering him (among other things), a base salary of $180,000 and a bonus based on the performance of Benhenni and BEST.  (Petition ¶ 14).  But Benhenni appears to have been dissatisfied with this offer.  He countered that $180,000 effectively annualized his *part*-time consultancy rate (i.e., $15,000/month), whereas his annual compensation at Morgan Stanley as a consultant was $700,000 annually.  (*Id.* ¶ 15; Benhenni Aff. ¶ 18).  Benhenni also relayed that his initial consultancy rate proposal—i.e., $250/hour—equated to approximately $500,000 annually. (Petition ¶ 16).

Benhenni claims that BEST acknowledged that his compensation demand of approximately $550,000 to $650,000 "was in line with [financial] industry standard[s]," but that BEST could not pay such a base salary.  (*Id.* ¶¶ 17-18).  Nevertheless, according to Benhenni, BEST indicated that Benhenni's participation in "the BEST bonus pool based on his and the firm's performance" would make his compensation consistent with his past compensation "if he met or exceeded performance expectation."  (*Id.* ¶ 18).  And, based upon the representation that Benhenni would "have a salary plus a performance-based bonus . . . and immediate participation in a deferred compensation plan," Benehenni accepted full-time employment with BEST.  (*Id.* ¶ 20).[3]

So, Benhenni executed an employment agreement that was effective January 1, 2013. (*Id.* ¶ 21; *see also* D.E. No. 1-5 ("Benhenni Employment Agmt.")).  The compensation provisions of this agreement were as follows:

---

[3] Benhenni states he told Quintana "that the salary being offered was much lower than [he] received at Morgan Stanley ($275k), and that [he] expected to participate greatly in the upside via the bonus to earn an equivalent total compensation to what [he] had earned at Morgan Stanley."  (Benhenni Aff. ¶ 20; *see also id.* ¶ 18 (stating that, when he "transferred over to full-time employment at Morgan Stanley, the firm had kept [his] total compensation target in line with [his] annual consultancy fee (*i.e.*, $550-$650k of which $275k was salary when [he] left Morgan Stanley")).  He states that Quintana and BEST's Chief Operating Officer "agreed verbally on this, but stated that they could not revise the bonus clause to add a specific amount as it was the 'standard employment agreement' they provided to other employees."  (*Id.* ¶ 20).

     4.1   <u>Base Salary</u>.  The Company shall pay Employee a base salary at the rate of $180,000 per annum.  The base salary shall be payable in accordance with the ordinary payroll practices of the Company.

     4.2   <u>Bonus</u>.  In the discretion of the Partners, based upon the performance of the Employee and the Company, Employee may receive an additional bonus in such amount and at such time as determined by the Partners[.]

(Benhenni Employment Agmt. ¶ 4).

Although the employee agreement sets forth that BEST employed Benhenni to do "research," Quintana purportedly asked Benhenni to go further and develop certain investment strategies and provide "related intellectual capital."  (Benhenni Employment Agmt. ¶ 2; Petition ¶ 22; *see also* Benhenni Aff. ¶¶ 26-28).  Benhenni claims that Quintana told him that achieving a certain return would meet BEST's investment objective and be reflected in Benhenni's bonus compensation.  (Petition ¶ 22).

According to Benhenni, over the course of 2013, Quintana's expectations were significantly surpassed and Benhenni's contributions resulted in an "outstanding performance." (*Id.* ¶ 23; Benhenni Aff. ¶ 25).  And Benhenni stresses that he performed certain tasks that were "beyond his research responsibilities."  (Petition ¶ 24; *see also* Benhenni Aff. ¶ 26).

At the end of 2013, BEST offered Benhenni a bonus of $10,000—i.e., 5% of his annual salary.  (Petition ¶ 25; Benhenni Aff. ¶ 29; *see also* Petition ¶ 26 ("By way of reference[,] Benhenni's 'discretionary bonus' at Morgan Stanley was 200% of his base salary")).  Benhenni notes that Quintana acknowledged his "laudable performance" and BEST's "excess return," yet offered him a bonus that was "completely inconsistent with [his] outstanding performance, his contribution to BEST's performance, the intent of the parties' agreement, and his prior

compensation at other firms (that BEST was well aware of)."   (Petition ¶ 25; *see also* Benhenni Aff. ¶ 29).

So, Benhenni protested.   (Petition ¶¶ 25, 26; Benhenni Aff. ¶¶ 29, 30).   Quintana responded that Benhenni's bonus was limited to be consistent with the overall compensation of five other—more junior—employees (who received lower base salaries).   (Petition ¶ 25; Benhenni Aff. ¶ 29).   Further, Quintana "rebuff[ed]" Benhenni's complaint by saying, among other things, that "his performance was immaterial because the bonus payment was 'discretionary'" and "his compensation would unlikely change in the near future."   (Petition ¶ 27).   BEST apparently "withheld even the offered $10,000 bonus payment."   (Benhenni Aff. ¶ 31).

Benhenni accordingly advised BEST that he "deemed BEST's conduct to constitute constructive discharge."   (*Id.*).   Benhenni's viewed BEST's compensation package as essentially "a full-time position equivalent to what it had paid him for part-time consultant work."   (Petition ¶ 29 n.2).

### III.   The Arbitration Proceedings[4]

Benhenni subsequently filed a demand for arbitration with the American Arbitration Association ("AAA").   (Petition ¶ 29; D.E. No. 1-8).   He asserted several claims and sought damages of at least $375,000 based on BEST's purported failure to pay him a proper bonus under the employment agreement.   (*Id.*).   After BEST filed an AAA Employment Arbitration Rule 27 motion to dismiss, the Arbitrator issued an "Interim Opinion and Award" dismissing in entirety all claims except Benhenni's breach-of-contract claim.   (Petition ¶¶ 30-32; Interim Arb.

---

[4] Neither side disputes the propriety of Benhenni's commencement of arbitration proceedings.   Indeed, the employment agreement appears to mandate arbitration given the nature of the dispute and, as discussed *infra*, both sides agree that the employment agreement has a binding arbitration clause.   (*See* Benhenni Employment Agmt. ¶ 14).

Opinion & Award at 23).  And, regarding Benhenni's breach-of-contract claim, the Arbitrator granted-in-part and denied-in-part BEST's motion to dismiss.  (Interim Arb. Opinion & Award at 23).

In particular, the arbitrator ruled that BEST's motion was *denied* "with respect to a determination of whether the 'Partners' exercised discretion to grant a bonus to [Benhenni] for 2013 in the amount of $10,000 as alleged and, if so, whether the failure to pay this bonus was a breach of the parties' Employment Agreement." (*Id.*).  But, "[i]n all other respects, the breach of contract claim [was] dismissed with prejudice." (*Id.*).

Thereafter, BEST consented to entry of a final award against it for $10,000 "in connection with the remaining breach of contract claim in lieu of a hearing on the open issues." (D.E. No. 1-1 ("Final Arb. Award") at 2).  Accordingly, the arbitrator issued a final award that effectuated the following: (1) incorporated by reference and made final the arbitrator's Interim Opinion and Award on BEST's motion to dismiss; (2) ordered BEST to pay Benhenni $10,000 in connection with Benhenni's breach-of-contract claim; and (3) set forth that the final award was "in full settlement of all claims and defenses submitted" for arbitration.  (*Id.* at 2-3).  Further, the final award delineated $4,900 in AAA administrative fees and expenses and $20,940 in compensation for the arbitrator.  (*Id.* at 3).

Benhenni then filed the instant petition before this Court.

## IV.  Legal Standard

"It is rare . . . to disturb an arbitration award." *Freeman v. Pittsburgh Glass Works, LLC*, 709 F.3d 240, 251 (3d Cir. 2013).  Indeed, "[t]here is a strong presumption under the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*, in favor of enforcing arbitration awards." *Brentwood Med. Assocs. v. United Mine Workers of Am.*, 396 F.3d 237, 241 (3d Cir. 2005).

So, "mindful of the strong federal policy in favor of commercial arbitration, [the Third Circuit] begin[s] with the presumption that the award is enforceable." *Sutter v. Oxford Health Plans LLC*, 675 F.3d 215, 219 (3d Cir. 2012) (citation omitted), *aff'd*, 133 S. Ct. 2064 (2013); *see also Bellantuono v. ICAP Sec. USA, LLC*, 557 F. App'x 168, 173 (3d Cir. 2014) ("Our review of the arbitration award itself . . . 'could be generously described only as extremely deferential.'" (quoting *Dluhos v. Strasberg*, 321 F.3d 365, 372 (3d Cir. 2003))).

"If a dispute-resolution mechanism indeed constitutes arbitration under the [Federal Arbitration Act], then a district court may vacate it only under exceedingly narrow circumstances." *Dluhos*, 321 F.3d at 370 (citing 9 U.S.C. § 10). Specifically, under Section 10 of the FAA, a district court can vacate an award only under one of the following four narrow grounds:

> (1) where the award was procured by corruption, fraud, or undue means;
>
> (2) where there was evident partiality or corruption in the arbitrators, or either of them;
>
> (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
>
> (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

*Sutter*, 675 F.3d at 219 (quoting 9 U.S.C. § 10(a)); *see also Bellantuono*, 557 F. App'x at 173 ("The narrow circumstances under which a court may vacate an arbitration award are defined exclusively in Section 10 of the FAA.").[5]

---

[5] This "limited judicial review . . . 'maintain[s] arbitration's essential virtue of resolving disputes straightaway.'" *Oxford Health Plans LLC v. Sutter*, 133 S. Ct. 2064, 2068 (2013) (quoting *Hall Street Assocs., L.L.C. v. Mattel, Inc.*,

Thus, "[t]he party seeking to overturn an award bears a heavy burden" given the "exceptional deference" conferred to arbitration decisions and the "exceedingly narrow circumstances" provided under Section 10 of the FAA.  *Handley v. Chase Bank USA NA*, 387 F. App'x 166, 168 (3d Cir. 2010) (citation omitted).[6]

## V.   Discussion

Benhenni seeks to vacate that portion of the arbitration award that "granted BEST's motion to dismiss and limited Benhenni's breach of contract claim to $10,000."  (Petition ¶ 35). He "argues that the Arbitrator's limitation of his damages to $10,000 at the pleading stage was improper."  (*Id.* ¶ 35 n.3).  Benhenni seeks vacatur based on Sections 10(a)(3) and 10(a)(4) of the FAA.  (*See, e.g.*, D.E. No. 13 ("Reply Br.") at 3, 6).

To reiterate, those two Sections of the FAA provide that this Court may vacate an arbitration award:

> (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
>
> (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

*See Sutter*, 675 F.3d at 219 (quoting 9 U.S.C. § 10(a)).

---

552 U.S. 576, 588 (2008)) (alteration in original).  "If parties could take full-bore legal and evidentiary appeals, arbitration would become merely a prelude to a more cumbersome and time-consuming judicial review process." *Id.* (internal quotation marks and citation omitted).

[6] Under Section 11 of the FAA, a federal district court may modify or correct an arbitration award under certain circumstances.  *See* 9 U.S.C. § 11.  Petitioner, however, does not present any argument in relation to Section 11.

### A. The Court is not Persuaded by Petitioner's Arguments Concerning Section 10(a)(4)

For Section 10(a)(4), Benhenni proffers three contentions.  The Court finds that none of them warrant vacatur.

#### 1. Benhenni asserts that the arbitrator's interpretation of the bonus clause was irrational

Benhenni contends that, although the arbitrator "held Petitioner's bonus to be discretionary, clearly that did not end the inquiry under any rational interpretation of the bonus clause." (Reply Br. at 6).  He argues that, "[o]nce BEST exercised its discretion to pay Petitioner an additional bonus, it was to be determined based on his performance and that of the company." (*Id.*).  Benhenni posits that, "[i]f BEST had wanted to have the amount of the bonus be purely discretionary, *i.e.*, not performance-based, it could have put such language in the bonus clause"; instead, "the bonus was to be determined based on performance."  (*Id.*).  In other words, Benhenni contends that a bonus clause is truly discretionary if "there are no factors to consider in making a decision."  (Reply Br. at 7 (emphasis removed)).

But Benhenni states that, here, "both Petitioner's performance and that of the Company are to be considered by the unambiguous language of the bonus clause."  (*Id.*).  And by holding that Benhenni's bonus was discretionary, Benhenni argues that the arbitrator failed to consider "the 'determination' language related to Benhenni's performance."  (Mov. Br. at 16).  So Benhenni contends that the employment agreement's bonus provision should be interpreted as follows: "although the bonus was discretionary, once BEST decided to award a bonus, it was to be calculated based upon his performance (its impact on the firm revenue) <u>and</u> the Company's performance (*i.e.*, excess revenue)."  (*Id.*).  In sum, Benhenni argues that the arbitrator "held that

there could only be one interpretation of the bonus clause"—which "is flawed reasoning as a matter of law."  (Reply Br. at 7).[7]

"Because the parties 'bargained for the arbitrator's construction of their agreement,' an arbitral decision 'even arguably construing or applying the contract' must stand, regardless of a court's view of its (de)merits."  *Oxford Health Plans*, 133 S. Ct. at 2068 (quoting *Eastern Associated Coal Corp. v. Mine Workers*, 531 U.S. 57, 62 (2000)).  "[C]onvincing a court of an arbitrator's error—even his grave error—is not enough."  *Id.* at 2070.  Accordingly, "the sole question for" this Court "is whether the arbitrator (even arguably) interpreted the parties' contract, not whether he got its meaning right or wrong."  *See id.* at 2068, 2070 (stating that Section 10(a)(4) "permits courts to vacate an arbitral decision only when the arbitrator strayed from his delegated task of interpreting a contract, not when he performed that task poorly").

As reproduced above, the bonus clause at issue reads as follows:

> 4.2    <u>Bonus</u>.  In the discretion of the Partners, based upon the performance of the Employee and the Company, Employee may receive an additional bonus in such amount and at such time as determined by the Partners[.]

(Benhenni Employment Agmt. ¶ 4).  And the employment agreement's arbitration clause sets forth that, "[s]hould any dispute arise as to the interpretation of any term or provision" of the agreement, "the issue shall be decided by arbitration."  (*Id.* ¶ 14).

The Court finds that the arbitrator's decision and award arguably construes the bonus clause, *see Oxford Health Plans*, 133 S. Ct. at 2068, and rejects Benhenni's invitation to vacate

---

[7] (*See also* Petition ¶ 38 ("[T]he Award was premised on an incomplete interpretation of the bonus clause that ignored the disjointed language. The [a]rbitrator literally copied sections of Respondent's motion papers to support her interpretation of the bonus clause . . . . Clearly, the Award did not permit consideration of the language related to Benhenni's performance, and the [a]rbitrator exceeded her authority as interpreter of the parties' agreement.")).

the award because the arbitrator "held that there could only be one interpretation of the bonus clause," (*see* Reply Br. at 7).

In a thorough and careful analysis, the arbitrator interpreted the bonus-clause language and explained why she determined that the language in Section 4.2 is not ambiguous. (*See* Interim Arb. Opinion & Award at 10-12). In particular, the arbitrator considered the words "may" and "discretion," and even reviewed a wealth of case law concerning the definition of the latter term. (*See id.* at 11). The arbitrator also compared and contrasted the language-at-issue with bonus clauses litigated in other cases. (*See id.* at 12 & 12 n.6).

Benhenni, however, appears to seek a different interpretation than that reached by the arbitrator—i.e., "although the bonus was discretionary, once BEST decided to award a bonus, it was to be calculated based upon his performance (its impact on the firm revenue) and the Company's performance (i.e., excess revenue)." (*See* Mov. Br. at 16). In other words, as noted above, Benhenni contends that the arbitrator should have interpreted the bonus clause as not being truly discretionary because a truly discretionary one has "no factors to consider in making a decision." (*See* Reply Br. at 7 (emphasis removed)).

Such disagreement with an arbitrator's interpretation of contractual language—although labeled as "completely irrational"—cannot be a sufficient basis to vacate an award under 9 U.S.C. § 10(a)(4). *See Oxford Health Plans*, 133 S. Ct. at 2070 ("[C]onvincing a court of an arbitrator's error—even his grave error—is not enough. So long as the arbitrator was 'arguably construing' the contract . . . a court may not correct his mistakes under § 10(a)(4).").[8] After all, Benhenni agreed to arbitration of "any dispute aris[ing] as to the interpretation" of the bonus

---

[8] *See also Washington Hosp. v. SEIU Healthcare Inc. Pa.*, 615 F. App'x 56, 62 (3d Cir. 2015) ("The [Appellant] . . . seeks to vacate the arbitrator's decision and award pursuant to 9 U.S.C. § 10(a)(4) of the Federal Arbitration Act . . . . The question for our review is whether the arbitrator (even arguably) interpreted the [collective bargaining agreement], not whether he got its meaning right or wrong. We conclude that the arbitrator's decision and award 'arguably construes' the [collective bargaining agreement] and that the arbitrator did not exceed his authority." (internal citations and quotation marks omitted)).

clause.  (*See* Benhenni Employment Agmt. ¶ 14).   He "must now live with that choice" as the arbitrator did what was required of her: "[she] provided an interpretation of the contract resolving [the] disputed issue."   *See Oxford Health Plans*, 133 S. Ct. at 2071.  And, even if the arbitrator's interpretation "mistakenly" went against Benhenni, he "does not get to rerun the matter in a court."   *See id.* ("Under § 10(a)(4), the question for a judge is not whether the arbitrator construed the parties' contract correctly, but whether he construed it at all.").

> **2.   Benhenni asserts that the arbitrator's interpretation of the bonus clause was irrational based on the parties' prior course of dealing and securities industry standards**

Benhenni argues that, under New Jersey law, if there is ambiguity in contract interpretation, "parol evidence is admissible, not to change the unambiguous terms, but to put the words in context."  (Reply Br. at 8 (citation and emphasis omitted)).  He contends that, even if "the contract is free from ambiguity and there exists an integration clause," then the Court "may supply terms."  (*Id.*).  Benhenni argues that the "Award's holding that that [sic] Petitioner is prohibited from implying terms of the contract is without foundation, and the cases cited in the Award do not support that premise."  (*Id.*).  Instead, relying on New York case law given the purported lack of "cases in New Jersey dealing with the issue of discretionary bonuses," he asserts that the arbitration award must be vacated.  (*See* Mov. Br. at 21-23; *see also* Reply Br. at 9-10).

In particular, Benhenni argues that a bonus under his employment agreement "was an integral part of his overall compensation"—and New York courts recognize that, when a bonus is an integral part of a compensation package and has been earned, the employer cannot argue that the bonus is discretionary.  (*See* Mov. Br. at 20, 22).  Benhenni references financial industry standards, averring that "hedge funds operate in a pay for performance" manner and bonus

payments "are the bulk of the total compensation" that "are determined by the experience of the individual and the performance of the fund." (*See* Reply Br. at 10 (emphasis removed)).[9]

In sum, Benhenni petitions that the arbitrator "ignored the essence of the parties' agreement regarding the bonus payment and precluded the introduction of evidence of securities industry practice concerning discretionary bonuses or the parties' prior course of conduct." (Petition ¶ 39). Benhenni maintains that the arbitrator should have interpreted the agreement in light of "prior arbitral decisions and extrinsic evidence of custom and practice of the parties." (Mov. Br. at 18 (citations omitted)).

As an initial matter, the Court finds the arbitrator aptly relied on the integration clause to exclude "prior course of dealing," (*e.g.*, Reply Br. at 7), and any other verbal discussions cited by Benhenni, (*e.g.*, Benhenni Aff. ¶ 20). That clause states that: "This is the entire agreement between the parties, and supersedes any and all prior agreements or representations between the parties, both oral and written. Any revisions, clarifications or supplements to this agreement must be in writing signed by both parties." (Benhenni Employment Agmt. at 3; *see also* Interim Arb. Opinion & Award at 14).

In fact, it is simply unclear to the Court how in the underlying arbitration award—much less under the extremely deferential standard of review for the instant petition—Benhenni posits that it would be a mistake not to consider prior conversations or purported verbal agreements given such an unequivocal integration clause. *See Viglione v. Frisina*, No. A-5668-11T2, 2013 WL 1457581, at *6 (N.J. Super. Ct. App. Div. Apr. 11, 2013) ("Where a contract demonstrates that the parties have merged all prior negotiations and agreements in writing, the parol evidence

---

[9] (*See also* Mov. Br. at 20 ("[I]t is well-known that, on Wall Street, the compensation packages of many senior level securities industry professionals are comprised of both salary and bonus. It is essential to retain that talent. Quintana and [BEST's Chief Operating Officer] having worked with Mr. Benhenni before in that industry were no strangers to that notion. . . . He was and is merely seeking enforcement of the parties' intent. The Award precluded the introduction of such evidence by relying on the Agreement's integration clause.")).

rule bars evidence of prior negotiations and agreements tending to add or vary the terms of the writing being considered. This tenet is especially true when the contract itself contains an integration clause." (citations omitted)).  Benhenni has no persuasive response to the tenet set forth in *Viglione*; indeed, accepting his position effectively eviscerates the integration clause.

And the Court's citation of New Jersey law case leads to the next problem with Benhenni's arguments: his overwhelming reliance on New York case law.  As the arbitrator thoroughly discussed, (*see* Interim Arb. Opinion & Award at 5-8), the employment agreement has a choice-of-law provision: "This Agreement shall be construed, interpreted and governed in accordance with the laws of New Jersey without reference to such state's rules relating to conflicts of laws." (Benhenni Employment Agmt. ¶ 13).[10]  Benhenni supplies this Court with no persuasive reason for disturbing the arbitrator's analysis in view of *New York* case law—in spite of the unambiguous *New Jersey* choice-of-law provision—and in light of the extremely deferential standard of review this Court must use.

Finally, as to Benhenni's insistence that the arbitrator wrongfully barred consideration of securities industry practice, the Court is not persuaded.  As such, accepting Benhenni's contention effectively means reaching a different interpretation of the bonus clause than the one reached by the arbitrator.  In particular, the arbitrator interpreted the bonus clause as follows:

> [G]iven the plain meaning of the contract language . . . the clause cannot reasonably be interpreted to provide Benhenni a right, guarantee or absolute entitlement to receipt of a bonus, *much less a bonus in an amount consistent with industry standards*, past practice or in any other amount. . . . *Nowhere in section 4.2 (or elsewhere in the Employment Agreement) is there any language expressing an intent* to guarantee that a bonus will be paid to

---

[10] Commendably, however, the arbitrator nevertheless undertook the task of considering New York law.  (Interim Arb. Opinion & Award at 8 ("I find that the New Jersey law applies to the claims asserted in this case. Significantly, however, while I find that New Jersey law applies, as demonstrated in the discussion below, the law is largely the same in both jurisdictions . . . .")).

> Benhenni or, *if paid, that the bonus will be a certain amount based on industry standards*, prior practice or having met specific goals or targets. . . . [G]iven the clear and unambiguous language of the agreement, BEST did not breach the contract by failing to pay a bonus that met Benhenni's expectations or that otherwise was consistent with industry standards.

(Interim Arb. Opinion & Award at 12-15 (emphases added)).  As stated above, Benhenni "does not get to rerun" the interpretation of the bonus clause in this Court.  *See Oxford Health Plans*, 133 S. Ct. at 2071.

In any event, it is apparent that Benhenni is impermissibly seeking to modify the bonus clause to express an intention that was not expressed in writing—i.e., that the bonus should be measured against securities industry standards.  Particularly given the standard of review this Court must apply, the arbitrator could not have erred in this regard.  *See Conway v. 287 Corp. Ctr. Assocs.*, 901 A.2d 341, 347 (N.J. 2006) ("The admission of evidence of extrinsic facts is not for the purpose of changing the writing, but to secure light by which to measure its actual significance. Such evidence is adducible only for the purpose of interpreting the writing—not for the purpose of modifying or enlarging or curtailing its terms, but to aid in determining the meaning of what has been said. So far as the evidence tends to show, not the meaning of the writing, but an intention wholly unexpressed in the writing, it is irrelevant." (citation omitted)).

### 3. Benhenni asserts that the arbitrator exceeded her authority given the parties' submissions and the AAA Employment Rules

Benhenni states that, although the parties agreed to submit their dispute to arbitration pursuant to AAA rules, the employment agreement "is silent as to remedies by the [a]rbitrator"—and Rule 39(d) of the AAA's Employment Rules permits an arbitrator to "grant any remedy or relief that would have been available to the parties had the matter been heard in court."  (Reply Br. at 11 (internal quotation marks and citations omitted)).  Benhenni contends

that the arbitrator held that he "pled a set of facts to support a claim for a breach of contract," but that "a fact determination would not have been in the Court's discretion" at such an early stage under the Federal Rules of Civil Procedure.   (Mov. Br. at 12-13).   He seems to argue that, although the arbitrator characterized her analysis of BEST's dispositive motion as a "motion to dismiss," the "determination of the amount of bonus due Benhenni [sic] was a fact, not legal issue, and neither party requested the relief provided by the Arbitrator."   (Reply Br. at 11).   So, Benhenni asserts that the arbitrator exceeded her authority given the parties' submissions and AAA Employment Rules.   (*Id.* at 10).

The following AAA Employment Arbitration Rules appear material to Benhenni's argument.[11]

Rule 9, which concerns discovery, provides that the "arbitrator shall have the authority to order such discovery, by way of deposition, interrogatory, document production, or otherwise, as the arbitrator considers necessary to a full and fair exploration of the issues in dispute, consistent with the expedited nature of arbitration."   AAA Emp't Arbitration Rules & Mediation Procedures ("AAA Rules") at 19.

Rule 27, which concerns dispositive motion practice, provides that the "arbitrator may allow the filing of a dispositive motion if the arbitrator determines that the moving party has shown substantial cause that the motion is likely to succeed and dispose of or narrow the issues in the case."   *Id.* at 24.

Rule 28, which concerns the "Order of Proceedings," provides that the "arbitrator has the authority to set the rules for the conduct of the proceedings and shall exercise that authority to

---

[11] The AAA Employment Rules reproduced in this Opinion are available at:
https://www.adr.org/aaa/ShowProperty?nodeId=/UCM/ADRSTG_004362.

afford a full and equal opportunity to all parties to present any evidence that the arbitrator deems material and relevant to the resolution of the dispute." *Id.* at 25.

And, finally, Rule 39(d), which concerns the arbitration award itself, provides that the "arbitrator may grant any remedy or relief that would have been available to the parties had the matter been heard in court including awards of attorney's fees and costs, in accordance with applicable law." *Id.* at 29.

Benhenni cites these Rules and essentially complains that the arbitrator improperly precluded discovery and improperly made a fact determination. (*See, e.g.*, Mov. Br. at 11-13; Reply Br. at 11-12). But the premise of Benhenni's position is flawed. As an initial matter, none of the Rules appear to mandate discovery; they permit discovery as "necessary to a full and fair exploration of the issues in dispute." *See* Rule 9, AAA Rules at 19. So Benhenni has it backwards when he asserts that "[n]owhere do the rules suggest that discovery should be precluded." (*See* Reply Br. at 12). The point here is that discovery is not necessarily mandatory under the AAA Employment Arbitration Rules—and Benhenni is arguing that it was improperly precluded.

To that extent, Benhenni posits that discovery was necessarily relevant to the bonus-clause interpretation dispute brought to the arbitrator. But the arbitrator applied the relevant law for interpreting contractual language and concluded that:

> given the clear and unambiguous language of the agreement, BEST did not breach the contract by failing to pay a bonus that met Benhenni's expectations or that otherwise was consistent with industry standards. To the extent, therefore, that Benhenni asserts a claim for breach of contract for payment of a bonus of $375,000 or of any amount other than offered by BEST in December 2013, the claim is properly dismissed as a matter of law . . . .

(*See* Interim Arb. Opinion & Award at 15).

- 20 -

So, here again, accepting Benhenni's contention effectively means reaching a different interpretation of the bonus clause than the one reached by the arbitrator—which, as explained above, the Court cannot do.   After all, the arbitrator interpreted the bonus clause and determined—as a matter of *law*—that: (1) the bonus clause was not ambiguous; (2) Benhenni does not have "a right, guarantee or absolute entitlement to receipt of a bonus, much less a bonus in an amount consistent with industry standards, past practice or in any other amount" because "Benhenni's receipt of a bonus of any amount was discretionary"; and, notably, (3) the extrinsic evidence Benhenni sought to admit would contravene New Jersey law by "supply[ing] terms that were not included in the contract."   (*See id.* at 10-15).[12]   And, to be sure, the arbitrator ruled partly in favor of Benhenni by determining that, based on his claims, it appeared that discretion was exercised to award him a bonus of $10,000 and this was not paid—which was a "cognizable claim for breach of contract."   (*Id.* at 15).

Accordingly, the Court cannot vacate the arbitration award under 9 U.S.C. § 10(a)(4).

## B. The Court is not Persuaded by Petitioner's Argument Concerning Section 10(a)(3)

For his Section 10(a)(3) contention, Benhenni argues that the arbitration proceedings here involved dispositive motion practice without the arbitrator having "permit[ted] the parties to engage in <u>any</u> discovery including depositions, exchange of interrogatories and documents, or even oral argument on the dispositive motion."   (Reply Br. at 3-4).   He contends that federal courts "have vacated arbitration awards where the arbitrator's conduct undermined the arbitral

---

[12] *See also Selective Ins. of Am. v. Hudson East Pain Mgmt. Osteopathic Med.*, 46 A.3d 1272, 1276 (N.J. 2012) ("[T]he interpretation of contract language is a question of law") (citations omitted)); *Lee v. Carabetta*, 2014 WL 4098012, at *3 (N.J. Super. Ct. App. Div. Aug. 21, 2014) (per curiam) ("The interpretation of a contract is ordinarily a legal question for the trial court to decide and is subject to de novo review. While contract interpretation is a question of law, de novo review of a contract is predicated on the absence of a factual dispute at issue. Here, we perceive no factual dispute at all. The contract and memorandum of agreement both provided that the $500,000 deposit tendered by plaintiff was non-refundable. The purchaser failed to perform and the deposit was forfeited. This is precisely the scenario provided for under the contract." (internal citations omitted)).

process by refusing to hear evidence pertinent and material to the controversy." (*Id.* at 4 (citation omitted)).   And Benhenni asserts that, here, the arbitrator did not provide "an adequate opportunity to present . . . evidence and argument." (*Id.*).

He argues that, instead, the arbitrator denied him "the opportunity to conduct discovery and precluded cross-examination of Respondent's principals as to how they determined his 2013 bonus based on his exemplary performance . . . or that of his co-workers' who had identical bonus clauses in their agreements." (*Id.*; *see also* Mov. Br. at 14 ("While the Award held that BEST breached the contract by not paying Benhenni a bonus, it limited the damages on Benhenni's claim and denied Petitioner the opportunity to conduct discovery or present evidence of the parties' discussions surrounding the payment of his bonus. Benhenni was not permitted to present evidence or cross-examine adverse witness [sic].")).   In short, Benhenni contends that he "was not permitted to present evidence challenging BEST's determination of his bonus amount" and, therefore, "excluded evidence plainly pertinent and material to the controversy." (Reply Br. at 4-5 (citation and internal quotation marks omitted)).

To be sure, Benhenni avers that the arbitrator "envisioned a final hearing to the extent that Petitioner's damages and Respondent's exposure were limited to $10,000"—but that this "made a hearing on the merits impractical from a cost/benefit viewpoint" given "the $25,000 the [a]rbitrator had already charged and the legal fees incurred by the parties." (*Id.* at 5).[13]

Section 10(a)(3) provides that the Court may vacate an arbitration award "where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause

---

[13] (*See also* Petition ¶ 37 ("[T]he [a]rbitrator exceeded the scope of the issues presented to her by making a factual determination without discovery, limiting Petitioner's breach of contract damages as to BEST's determination of the bonus amount, and making a hearing on the merits impractical. In doing so, Benhenni's rights were prejudiced as the [a]rbitrator did not allow Petitioner to conduct discovery or present evidence of the parties' discussions surrounding the payment of his bonus. Benhenni was not permitted present [sic] evidence or cross-examine adverse witnesses . . . . Thus, Petitioner's rights were prejudiced and he was precluded from a fundamentally fair hearing on the merits inherent in the arbitral process.")).

shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced." *See Sutter*, 675 F.3d at 219 (quoting 9 U.S.C. § 10(a)).

But Benhenni's arguments relating to Section 10(a)(3) appear to be very similar—if not the same—as those he raises under Section 10(a)(4). (*Compare* Reply Br. at 3-4 (arguing arbitral misconduct under Section 10(a)(3) because the arbitrator "denied Petitioner the opportunity to conduct discovery and precluded cross-examination" and "Petitioner was not permitted to present evidence challenging BEST's determination of his bonus amount), *with* Reply Br. at 6, 10-12 (arguing that the arbitrator exceeded her authority under Section 10(a)(4) because the AAA Employment Rules "allow[] witnesses to be subject to direct and cross examination" and do not "suggest that discovery should be precluded")).

Although Benhenni essentially repackages his Section 10(a)(4) arguments under Section 10(a)(3) and argues that the arbitrator excluded "evidence pertinent and material to the controversy," (*see* Reply Br. at 4), the Court finds—for the reasons discussed under Section 10(a)(4)—that the arbitrator did no such thing. Here too, the foundation of Benhenni's argument rests on his fundamental disagreement with the arbitrator's interpretation of the contract. After all, if one accepts—as this Court must—that the arbitrator's interpretation of the contractual language bars introduction of extrinsic evidence intended to supply terms to the contract, then the arbitrator cannot possibly be "guilty of misconduct" for purportedly "refusing to hear evidence pertinent and material to the controversy." *See* 9 U.S.C. § 10(a)(3).

Accordingly, the Court cannot vacate the arbitration award under 9 U.S.C. § 10(a)(3).

## VI.    Conclusion

As the arbitrator noted, "[i]t is understandable that Benhenni was disappointed with the amount of bonus offered to him in December 2013; the amount did not meet his expectations." (Interim Arb. Opinion & Award at 15).   But the arbitrator did what she was tasked to do: determine what the employment agreement, in particular the bonus clause, meant—notwithstanding any such disappointment.

And this Court is tasked with a limited judicial review of the arbitration award in view of that interpretation—a task which should "maintain arbitration's essential virtue of resolving disputes straightaway."  *See Hall Street Assocs.*, 552 U.S. at 588.   In fact, it appears that Benhenni is trying to do exactly what the Supreme Court recently cautioned against: taking a "full-bore legal and evidentiary appeal[]" of an award and making arbitration "merely a prelude to a more cumbersome and time-consuming judicial review process."  *See Oxford Health Plans*, 133 S. Ct. at 2068 (quoting *Hall Street Assocs.*, 552 U.S. at 588).

For the reasons set forth in this Opinion, the Court declines to vacate the arbitration award under either 9 U.S.C. § 10(a)(3) or 9 U.S.C. § 10(a)(4).   And, because Benhenni advances no arguments under 9 U.S.C. § 11, the Court has no basis before it to modify or correct the arbitration award.   An appropriate Order accompanies this Opinion.

*s/Esther Salas*
**Esther Salas, U.S.D.J.**